1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  SUSAN KNIGHT (CABN 209013)
   HANLEY CHEW (CABN 189985)
5  Assistant United States Attorneys

6     150 Almaden Blvd., Suite 900
      San Jose, California 95113
7     Telephone:  (408) 535-5061
      FAX: (408) 535-5066
8     E-Mail: Susan.Knight@usdoj.gov
             Hanley.Chew@usdoj.gov
9
   Attorneys for Plaintiff
10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,        )   No.  CR 09-00670 EJD
                                     )        CR 11-00554 EJD
15        Plaintiff,                 )
                                     )   **UNITED STATES' POST-**
16        v.                         )   **EVIDENTIARY HEARING**
                                     )   **STATEMENT**
17  DAVID FOLEY,                     )
                                     )
18        Defendant.                 )   Date:   January 29, 2013
                                     )   Time:  9:00 a.m.
19  _____ )   Court: Honorable Edward J. Davila

20                        __INTRODUCTION__

21        Defendant David Foley entered into a plea agreement to resolve the above-captioned

22  cases.  Pursuant to the terms of the plea agreement, the parties agreed that the Court will resolve

23  certain factual issues relevant to the calculations provided for in the United States Sentencing

24  Guidelines.  In particular, the Court is asked to decide the loss amount for the defendant's

25  participation in a conspiracy to commit mail and wire fraud and conspiracy to commit bank

26  fraud.

27        On December 6 and 11, 2012, the Court held an evidentiary hearing where both the

28  government and the defendant presented witness testimony and documents on the issue of loss.

**UNITED STATES' STATEMENT**

1    The government submits this memorandum to assist the Court in evaluating the evidence

2    offered during the evidentiary hearing and to advise the Court of the government's position on

3    the loss amount for purposes of calculating a guideline range.

4    **A. The Burden of Proof is Preponderance of the Evidence.**

5    The government bears the burden of proof on the facts underlying the sentencing

6    enhancement. *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005). A district court's

7    findings of fact at sentencing, including those used in calculating the loss amount, must be

8    supported by a preponderance of the evidence. *United States v. Armstead*, 552 F.3d 769, 776 (9th

9    Cir. 2008). The amount of loss need not be determined with precision, rather the court need

10   only make a reasonable estimate of the loss. *See* U.S.S.G. § 2B1.1, App. n. 3(C) (2011).

11   **B. Conspiracy to Commit Mail and Wire Fraud.**

12   **i. Legal Authority On Calculating a Loss Amount For Conspiracy to Commit Mail**
13   **and Wire Fraud.**

14   Under Sentencing Guideline § 2B1.1(b)(1), the base offense level for crimes involving

15   mail and wire fraud are increased by the amount of loss. The Guidelines discuss two types of

16   loss: actual and intended. Actual loss is the "reasonably foreseeable pecuniary harm that

17   resulted from the offense." U.S.S.G. § 2B1.1, App. n. 3(A)(i). "Reasonably foreseeable

18   pecuniary harm" is pecuniary harm that the defendant knew or, under the circumstances,

19   reasonably should have known, was the potential result of the offense." § 2B1.1, App. n.

20   3(A)(iv). Intended loss "(I) means the pecuniary harm that was intended to result from

21   the offense; and (II) includes the intended pecuniary harm that would have been

22   impossible or unlikely to occur . . .". § 2B1.1, App. n. 3(A)(ii). In applying the

23   adjustment for loss, the Court is to apply the greater of actual or intended loss. § 2B1.1,

24   App. n. 3(A). Also, in calculating the intended loss amount, the trial court must take into

25   account "the full scope of the defendant's fraudulent conduct." *United States v. Tulaner*, 512

26   F.3d 576, 578 (9th Cir. 2008). However, "the court need only make a reasonable estimate of the

27   loss." U.S.S.G. § 2B1.1, App. n. 3(C), *see also United States v. Zolp*, 479 F.3d 715, 719 (9th

28   Cir. 2007).

**UNITED STATES' STATEMENT**          2

**ii. The Government Established that Global VR Was the Victim of The Defendant's Mail and Wire Fraud Conspiracy.**

Through the testimony of James DeRose, Robert Giovannettone, and FBI Special Agent Greg Fine, the government established that Global VR purchased all of UltraCade's assets, and was severely harmed by the defendant's illegal sale of game packs.

### a. Global VR Acquired All of UltraCade's Assets and Intellectual Property.

James DeRose, Global VR's former Chief Executive Officer, testified at length about the history of Global VR's acquisition of UltraCade, and that he believed that Global VR acquired everything necessary to manufacture UltraCade game packs. In the Fall of 2005, Mr. DeRose, at the direction of Global VR's Board of Directors, investigated the possibility of acquiring UltraCade. The defendant's sales agent had approached Global VR about an acquisition. *Transcript of Evidentiary Hearing*, p. 18, 10-22. Global VR was specifically interested in purchasing UltraCade because of its ability to create home arcade machines, which included "a technology that enabled the core unit, the arcade box, . . . with the monitor and the computer in it to be sold with a basic set of games." *See id.*, p. 15, 4-25. He explained that additional games could be added to the core unit using game packs, which contained additional games that were loaded on a "fob" similar to a USB drive. *See id.*, p. 15, 23-25; p. 16, 2-6.

Mr. DeRose and Robert Giovannettone, Global VR's Chief Financial Officer at the time, met with the defendant and his sales representative to review a private placement memorandum. Mr. DeRose believed that UltraCade would be a "good strategic fit" for Global VR, but found that the growth projections were unreasonably high. *See id.*, p. 17, 4-25. Mr. DeRose learned from the defendant that the company was struggling financially, so Global VR and the defendant proceeded with a Memorandum of Understanding ("MOU") on December 8, 2005. *See id.*, p. 18, 10-21. This allowed Global VR to investigate UltraCade as a potential acquisition. *See* Joint Exh. A, Confidential Memorandum of Understanding.

During the MOU period, Global VR learned that UltraCade had more substantial debts than they were initially aware of that made an acquisition "virtually impossible." *See id.*, p. 22, 22-25. On approximately February 4, 2006, Mr. DeRose and Mr. Giovannettone informed the

defendant that an acquisition could not take place as contemplated in the MOU. *See id.*, p. 23, 9-13. Global VR's counsel subsequently proposed an "assignment for the benefit of creditors" ("ABC") as a way for Global VR to acquire UltraCade. During an ABC, which is similar to a prepackaged bankruptcy, assets are assigned to a third party, who then sells them and distributes the funds to various creditors. The defendant decided to go forward with the ABC and assigned UltraCade's assets to Sherwood Partners. *See id.*, p. 25, 5-25; 26, 1-7. Global VR was the only company that bid for UltraCade's assets. *See id.*, p. 26, 17-22.

On June 2, 2006, UltraCade, Global VR, and Sherwood Partners finalized the ABC transaction, which was reflected in several documents. Mr. DeRose described what Global VR acquired through the ABC process:

> [W]e acquired virtually all of the technology and the licenses required to basically - First of all, there were certain assets, very specified assets in the process plus all of the technology and licenses required to perpetuate the business that [the defendant] had operated at UltraCade.

> [T]here was a list of games, certainly games that had been licensed by [the defendant], games that had been created by [the defendant], technology that had been created by [the defendant] or licensed by [the defendant].

*Id.*, p. 29, 15-25.

The defendant signed a Representation Letter, which was acknowledged by Global VR through Mr. DeRose's signature, in which the defendant transferred all of his rights to produce the games that had been produced by UltraCade. *See* Gov't Exh. 1, Representation Letter. Mr. DeRose testified that the representation letter "transfers basically all of the rights . . . to manufacture or to produce the games that had been produced by UltraCade previously." Furthermore, he said that "our understanding was that with this representation, we were getting everything that we needed in order to continue to conduct business in the normal course." This included game packs. *See id.*, p. 30, 22-25; 31, 1, 4-9.

UltraCade, Global VR, and Sherwood Partners signed an Asset Purchase Agreement. *See* Joint Exh. B, Asset Purchase Agreement. Mr. DeRose signed the agreement on behalf of Global VR, and testified that the document represented "a conveyance . . . of all of those assets acquired to conduct UltraCade's business." *Id.*, p. 32,

1    In addition, UltraCade, Global VR, and Sherwood Partners signed a Technology Asset

2  Purchase Agreement.  *See* Joint Exh. C, Technology Asset Purchase Agreement.  Mr. DeRose

3  signed this document on behalf of Global VR, which he characterized as:

4      [C]ritically important because it was the assignment or the transferring of the technology.
       The specific technology requires [sic] for us to conduct business, to continue to build home
5      arcade game machines, to continue to build or create game packs and have those game packs
       interface with the arcade machines.  This, in fact, was the nuts and bolts, if you will, of the
6      Agreement.

7  *Id.*, p. 33, 1-7.

8      Mr. DeRose's testimony, coupled with the documents, establishes that Global VR purchased

9  all ownership rights to UltraCade's assets and intellectual property.  In fact, Mr. DeRose stated

10  that Global VR would not have purchased UltraCade if the defendant retained the ability to

11  manufacture and sell UltraCade game packs after June 2006.  *See id.*, p. 120, 25; 120, 1-2..

12     Furthermore, the testimony of Robert Giovannettone, Global VR's former Chief Financial

13  Officer, and FBI Special Agent Greg Fine support Mr. DeRose's understanding that Global VR

14  purchased UltraCade's assets, which included the ability to make game packs.  As Mr.

15  Giovannettone, who was actively involved in the acquisition, testified:

16      I believed that we were acquiring all of the assets of UltraCade and all of the assets that
        Mr. Foley owned relating to the coin op business and all of the assets that Mr. Foley
17      owned in order for us to achieve the business plan.

18  This included the game packs.  *Id.*, p. 132, 19-24.

19     Special Agent Greg Fine testified that he interviewed Global VR employees, who told him

20  that Global VR had acquired the assets of UltraCade, which included UltraCade games packs and

21  everything necessary to make them.  *See id.*, p. 158, 18-25; 159, 1.

22     The defendant's argument that he retained the right to make game packs is contrary to the

23  fact that the above-referenced documents were signed by the defendant, Global VR, and

24  Sherwood Partners demonstrating the transfer of UltraCade's assets to Global VR.  In addition,

25  all of the individuals who were instrumental in Global VR acquisition of UltraCade - Mr.

26  DeRose, Mr. Giovannettone, and Global VR employees - believed that Global VR acquired the

27  right to make UltraCade game packs.

28  //

**UNITED STATES' STATEMENT**          5

         ***b.***     ***The Defendant's Conduct Demonstrates That He Knew He Was Harming Global VR By Selling UltraCade Game Packs to Co-Defendant Michael Daddona.***

First, the defendant never informed Global VR that he believed he retained the right to manufacture and sell UltraCade game packs after Global VR acquired UltraCade's assets through the ABC process on June 2, 2006. In fact, the defendant actively concealed it.

There were several events that lead to Global VR's discovery of the defendant's illegal game pack sales. In the Fall of 2006, Mr. DeRose conducted an investigation after Global VR had an unexpected shortfall in the sale of game packs. The sales were "far below" the projected sales that the defendant represented to them. *See id.*, p. 37, 19-22. He later learned that Global VR's customers had excessive levels of game pack inventory, including Automated Services, which was one of their largest purchasers. There were also "ridiculous price points in the marketplace," such as Michael Daddona, the owner of Automated Services, selling game packs to Global VR's customers "at prices below what we could sell them and sometimes virtually at cost." *See id.*, p. 39, 20-24.

Mr. DeRose also learned that Global VR's inventory was diverted to the defendant's residence after the signing of the MOU, and the inventory should have been transferred to Global VR as part of the Asset Purchase Agreement. Specifically, 1,100 fobs were missing: 200 had been ordered and shipped directly to the defendant's residence, and the remaining 900 were ordered and delivered to UltraCade, but were missing. *See id.*, p. 42, 15-25.

On September 21, 2006, Mr. DeRose, along with Ken Bayer, Executive Vice-President of Operations, Mr. Giovannettone, and Global VR's attorney confronted the defendant about the missing fobs. The defendant denied any wrongdoing and stated that there were no transfers of the fobs. Mr. DeRose impressed upon the defendant to "come clean," and the defendant insisted that he had not done anything wrong. *See id.*, p. 42, 16-25: 43, 1-2. The defendant never claimed during the meeting that he retained the right to manufacture and sell game packs. If the defendant truly believed that he had such a right, he would have informed Mr. DeRose at the time instead of requesting a day to provide an explanation.

The following day, Mr. DeRose, with Elaine Shirley, Global VR's Vice-President of Sales,

contacted Mr. Daddona, who admitted to purchasing games and game packs from the defendant "under the table" and paying him directly. *See id.*, p. 44, 20-25.   Mr. Daddona told Mr. DeRose that the game pack sales took place "from the time you engaged, before, during, and after" the closing of the deal, and he purchased "maybe thousands" of game packs. *See id.*, p. 45, 5-9; 13-19.

The defendant was terminated from Global VR on September 23, 2006.

The defendant had a second opportunity to discuss his alleged ability to manufacture game packs when he met with Mr. DeRose for a settlement meeting on October 11, 2006.  However, the defendant again failed to give any explanation for the missing fobs or game packs sales to Mr. Daddona. *See id.*, p. 48, 2-12.  It was only after he was caught illegally manufacturing and selling game packs to Mr. Daddona that he claimed that he was not the true owner of the game pack technology, merely a license holder.

Second, the defendant colluded with Mr. Daddona to hide his game pack sales from Global VR.  FBI Special Agent Greg Fine executed a search warrant on the defendant's residence, seized computers, and searched them. *See id.*, p. 167, 9-11.  He reviewed several emails that the defendant sent to Mr. Daddona.  Several referenced a "fluff account."  In order to distinguish when Mr. Daddona should pay the defendant directly instead of Global VR for game packs, they used the term "fluff account" to indicate that funds should be paid directly to the defendant. *See id.*, p. 168, 6-18.  For example, on January 6, 2006, the defendant wrote to Mr. Daddona "Did you get the games that you needed today?  Your others from the first fluff order should arrive on Tuesday." *See* Gov't Exh. 8.  Another email, dated January 10, 2006, demonstrates the defendant's efforts to hide his conduct from Global VR.  The email, which is from the defendant to Mr. Daddona, discusses a woman named "Elaine" whom Special Agent Fine believed to be Elaine Shirley, a sales person at Global VR. *See Transcript of Evidentiary Hearing,* p. 169, 11-12.  The email stated the following:

> Mike, you need to be very careful to not let onto our fluff account with you.  Elaine mentioned something to me about crediting "your other account."  That can't be known by anyone, just between me and you.  Please keep it separate and only talk to me about it.

*See* Gov't Exh. 9.

1   The defendant gave Mr. Daddona specific instructions on how to hide his purchases from

2   Global VR.  For example, in an email, dated July 17, 2006, the defendant advised Mr. Daddona

3   to take steps to hide his purchases from Global VR: "I'll have you purchase a few upgrades from

4   Global VR so that you can have some on the books, and I will ship you the balance."  *See* Gov't

5   Exh. 14.

6   The defendant also conspired with Mr. Daddona to reduce the price of game packs.  Special

7   Agent Fine found two emails on the defendant's computers in which "Elaine" was referenced,

8   whom he again believed to be Global VR employee Elaine Shirley.  *See Transcript of*

9   *Evidentiary Hearing*, p. 170, 11-18.  In an email dated July 1, 2006, Mr. Daddona told the

10   defendant that "Elaine" asked him to raise his price on eBay for game packs.  *See* Gov't Exh. 12.

11   The defendant then responded twice to the email.  In his first response to Mr. Daddona, dated

12   July 1, 2006, the defendant stated: "You do not have to raise your pricing on eBay, tell Elaine to

13   shove it."  *See id.*  In his second reply, dated July 7, 2006, the defendant told Mr. Daddona:

> I figured out a way to keep your prices low on eBay.  Have a Buy It Now price
> at the MSRP, and start the bidding at $0.  That way, you can tell Elaine that you
> have the buy it now at the MSRP and she can't complain.  Always have at least
> one auction with no bids on it and you can use that to show her.

17   *See* Gov't Exh. 13.

18   In sum, the defendant's conduct indicates that he was well aware that his game pack sales to

19   Mr. Daddona would harm Global VR.  If he truly believed that he had a legitimate right to sell

20   game packs, he would have so informed Global VR from the very beginning of his relationship

21   with the company, or at least when he was confronted about missing inventory on September 21,

22   2006.  The defendant's emails about his "fluff account" and instructions to Mr. Daddona to

23   mislead Global VR regarding his game pack purchases and game pack pricing speak for

24   themselves: the defendant intended to cause financial harm to Global VR.  Moreover, the

25   defendant, who was hired by Global VR as its Chief Technology Officer and Executive Vice-

26   President of Gaming on June 2, 2006, knew that he had an obligation to protect Global VR's

27   (and UltraCade's) propriety information and not to compete with the company.  *See* Joint Exh. D,

28   Employment Agreement.  Instead, as Mr. DeRose testified, he destroyed Global VR's market for

game pack sales by flooding the market with excess inventory of unauthorized UlraCade game packs.

### c.   The Defendant Operated and Controlled Buen Diseno In Order to Further Defraud Global VR.

The defendant claims that UltraCade never had an exclusive right to manufacture game packs because the technology known as a "key fob loader program" was owned by Roger Cross of Buen Diseno.  Therefore, the defendant had a right to manufacture the game packs because Mr. Cross allowed him to use the technology.  *See* Joint Pre-Evidentiary Hearing Statement, p. 7. He further claims that Global VR was aware of "UltraCade's non-exclusive license for the Key Fob Loader because the license was assigned to Global VR and later renewed by Global VR." *Id.*  His argument is meritless.  The evidence presented during the evidentiary hearing shows that Buen Diseno was a company operated by the defendant, who accessed and used all of the money deposited into the Buen Diseno bank account as another method to obtain more money from Global VR.

First, Mr. DeRose testified that the defendant never mentioned to Global VR until after the acquisition that Global VR was required to pay Roger Cross of Buen Diseno a licensing fee.  *See Transcript of Evidentiary Hearing*, P. 50, 20-25.  Mr. DeRose signed a licensing agreement with Mr. Cross of Buen Diseno on April 27, 2007 because he believed at the time that Global VR:

> [W]ould not really have any ability to derive any assets that we purchased from the games or licenses or the titles or anything because the technology that we learned Mr. Cross, owned, in fact, was critical in terms of producing and distributing those games.

*See id.*, p. 50, 1-6; *see also* Gov't Exh. 4, Amendment to License Agreement.

Mr. DeRose later learned about the defendant's business relationship with Mr. Cross through email correspondence provided by Mr. Daddona.  He stated that he would have never signed the licensing agreement with Mr. Cross if he knew about the relationship because the defendant had transferred all of his assets during the ABC process.  *See id.*, 51, 10-25.

Second, through his investigation, Special Agent Fine discovered that Buen Diseno was operated by the defendant.  Unbeknownst to Global VR, the defendant established Buen Diseno under the guise that it was owned by Mr. Cross, and had Global VR sign a licensing agreement

that included royalty payments.  *See id.*, p. 174 1-6; 10-12.  In an email dated February 14, 2006, which seized from the defendant's computer during a search warrant, he stated the following to Mr. Daddona:

> Here is what I have done.  Because I never wanted to give up all of my IP after having it taken away in the past, I setup a company called Buen Diseno (good design in Spanish) That company owns certain IP. No one knows that I own the company.  they (sic) think that my friend Roger, with whom I've worked together with since I was 18 is the owner, and that is a good perception, because he doesn't take home a paycheck, I pay him out of pocket.  Buen Diseno gets between $10 and $50 per machine, depending on the configuration for the arcade machine and pinball game.

*See* Gov't Exh. 18.

Another email, dated February 8, 2006, the defendant informed Mr. Cross, the alleged owner of Buen Diseno about incorporating the company in Nevada and signing licensing agreements:

> I'm incorporating Buen Diseno in Las Vegas today.  I've found a company that will incorporate us, work as a retained resident agent (able to take delivery and execute all fed and state documents), give us a permanent address in NV, post a business license, have a virtual phone number/voice mail.
>
> . . .
>
> Buen Diseno will immediately sign agreements with UltraCade (and it's successors) for royalties on technology that will (sic) license including several IP's that I or you have contributed to over the years.

*See* Gov't Exh. 19.

Special Agent Fine conducted a financial analysis of the royalty payments from Global VR to Bueno and found that the majority of the funds were spent by the defendant, specifically towards his mortgage.  *See Transcript of Evidentiary Hearing*, p. 174, 13-24.  He also found an email, dated December 18, 2006, from the defendant to Wells Fargo Bank requesting that the bank verify that his funds were available in the Buen Diseno account.  *See* Gov't, Exh. 23.

The defendant's statements are contrary to his representations to Global VR that Mr. Cross was the true owner of Buen Diseno.  The defendant's email correspondence, control and use of the Buen Diseno bank account for his own enrichment prove that he was owner of Buen Diseno. Mr. DeRose also testified that had he known about the defendant's relationship with Mr. Cross, he would have never signed the licensing agreement.

**UNITED STATES' STATEMENT**                    10

Finally, Mr. Cross' testimony should be discounted.  He was unconvincing in his claims about his control over the operation of Buen Diseno, and the defendant's role in the company.  In fact, Mr. Cross gave conflicting testimony about who developed the key fob loader program: he stated that he came up with the idea and shared it with the defendant.  The defendant then arranged for another individual, Mr. Thewlis, to develop the actual source code.  *See Transcript of Evidentiary Hearing*, p. 285, 19-25; 2861-2.  Mr. Cross admitted that the development of the source code for the key fob loader program was controlled by the defendant, and that he has no documentation proving that he or the defendant own it.  *See id.*, p. 286, 23-24: 288, 1-9.

### iii.   The Government Proved by a Preponderance of the Evidence That The Loss Amount Should be Calculated Using the Average Retail Value of the Game Packs.

Through the testimony of Mr. Giovannettone and Special Agent Fine, the government proved that the loss amount should be based upon the retail value of the game packs, which is approximately $479 a unit, multiplied by 3,211, the number of game packs sold by Mr. Daddona after June 2, 2006.   This results in a loss of $1,589.069, which warrants a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I).

First, the Court should adopt the figure of 3,211 games packs sold by Mr. Daddona because this figure was uncontested at the hearing.  During a search warrant executed at Mr. Daddona's business, Automated Services, Special Agent Fine seized an accounting report documenting the number of game packs that Mr. Daddona sold from June 2, 2006 to January 2008.  *See* Gov't Exh. 6, Quickbook Records of Automated Service's Sales of Game Packs.  According to Special Agent Fine's review of the records, Mr. Daddona sold approximately 3,211 game packs, the majority of which came from the defendant.  *See Transcript of Evidentiary Hearing*, p. 162, 12-17; 163, 6; 164, 22-23.  In addition, Special Agent Fine testified that the accounting records are reliable for two reasons: they were seized during a search warrant and not provided by Mr. Daddona or the defendant, and Mr. Daddona used the records to pay taxes and issue tax documents to the defendant.  *See id.*, p. 163, 13-19.

Furthermore, the evidence established that the retail value of the game packs - $479 a piece - was based on the defendant's own projections.  *See* Gov't Exh. 5, Analysis of Damages from

Foley's Activity.  Mr. Giovannettone testified that as Chief Financial Officer of Global VR, his role in the acquisition of UltraCade was to evaluate its finances and its potential profit to Global VR.  *See id.*, p. 126, 22-23.  He regularly met with the defendant, and worked with him to develop forecasts for UltraCade.  In addition, he constantly reviewed the projections for the sales of game packs, and used an average of $479 based on various scenarios that he and the defendant developed together.  *See id.*, p. 134, 24-25; 135, 8-10.  The defendant should not now be given the ability to walk away from his own projections.

Accordingly, the Court should adopt a loss of between 1,000,000 and $2,500,000 based on the above-referenced figures.  The number of game packs sold by Mr. Daddona is a reasonable best estimate of the loss amount because it only takes into consideration the games packs sold by Mr. Daddona after June 2, 2006, the date when all the assets and intellectual property of Ultracade and the defendant were fully transferred to Global VR.  The number of game packs sold - 3,211- is a conservative estimate in light of the fact that Mr. DeRose testified that the defendant's unauthorized game pack sales before the ABC was completed and low game pack prices harmed Global VR.  For example, defense counsel asked Mr. DeRose:

> So we agree that whatever Mr. Foley sold before December 8, 2005, and wherever it went after that, including Mr. Daddona and onto the reseller and then to the end users, that couldn't've have cost anything to Global VR, it that right?

Mr. DeRose then responded:

> If, in fact, our universe of game pack sales as we understood it was formally what was on the books, and in fact Mr. Foley had been selling off the books game packs in the marketplace, that could have a material impact not only on UltraCade, the company that we were acquiring, but also on the market condition into which we were entering.  So, yes, it could have a material impact on Global VR.

*See id.*, p. 62, 10-14, 25; 63, 1-6.

Mr. DeRose also testified about the "ridiculous price points in the marketplace," and pointed to Mr. Daddona's game pack sales at extremely low prices.  *See id.*, p. 39, 20-24.  The game pack sales prior to the ABC impacted the market, however, the government has chosen not to include them in the loss calculation.  The average retail price also was based on the defendant's own projections.  *See id.,* p. 134, 24-25; 135, 8-10.

A loss amount of approximately $1,589.069 represents the amount of money that Global VR

could have made if the defendant had not flooded the market with his cheap counterfeit Ultracade game packs. Mr. DeRose testified that a few months after Global VR's acquisition of the assets of Ultracade, they realized that sales of the Ultracade game packs had inexplicably plummeted. *See id.*, p. 37, 19-22. Global VR learned that Mr. Daddona's company had a substantial amount of inventory that he was selling for very low prices. *See id.*, p. 39, 20-24. The email exchanges between the defendant and Mr. Daddona prove that they were conspiring to hide game pack sales from Global VR and manipulating game pack prices. *See* Gov't Exh. 7-16.

**C.   Legal Authority and Argument Concerning The Determination of Loss In Bank Fraud Cases.**

**i.   Legal Authority On Calculating a Loss Amount For Bank Fraud.**

In determining loss for bank fraud, the Sentencing Guidelines discuss actual and intended loss. In applying the adjustment for loss, the Court is to apply the greater of actual or intended loss. § 2B1.1, App. n. 3(A); *United States v. McCormac*, 309 F.3d 623, 627 (9th Cir. 2002). The Guidelines have adopted a broad definition of "intended loss." *McCormac*, at 628. The current Guidelines "make clear that intended loss should not be an inquiry into intent to repay . . . but rather should focus on the intended financial harm." *Id.*, at 629. Furthermore, when a defendant pledges collateral for a loan that has not been disposed of by the time of sentencing, the Guidelines require that the loss be reduced by fair market value of the collateral. § 2B1.1, App. n. 3(E)(ii).

**ii.   The Defendant's Fraud on Countrywide Was Extensive.**

First, at the time that the defendant signed the Uniform Residential Loan Application ("URLA") for his home loan and equity line of credit, he was well aware that he lacked the financial ability to repay either loan and that the only way that Countrywide would go through with the loans was if he falsified information concerning his employment status and collateral sources of future income. The defendant was terminated from Global VR on September 23, 2006, and signed a copy of the URLA on October 3, 2006. *See* Joint Pre-Evidentiary Hearing Statement, p. 13, ¶¶ 11-12. He admitted in his plea agreement that he was unemployed at the time he signed the URLA, and he intentionally misrepresented his employment status to

Countrywide by attesting that he was still employed at Global VR.  *See* Plea Agreement, ¶ 2(c). The defendant also admitted that he had a co-worker lie to Countrywide when they contacted Global VR to confirm his employment.  He instructed Robert DeKett to verify his employment as stated in his URLA to Countrywide for his loan application despite Mr. DeKett being well aware that the defendant was no longer employed at Global VR or earning a salary at the time of the application.  *See* Plea Agreement, ¶ 2(e).

Second, the defendant falsified other sources of future income in order to bolster the appearance of his financial condition.  It is uncontested that the defendant submitted a false promissory note obligating Global VR to pay him $1,000,000 to Countrywide.  FBI Special Agent Greg Fine testified that he obtained the defendant's loan file from Countrywide, which included the loan application and documents submitted in support of the application.  *See Transcript of Evidentiary Hearing*, p. 184, 6, 22-25.  Special Agent Fine found a promissory note included in the loan file that he believed was a forgery for a variety of reasons, including the fact that it obligated Global VR to pay the defendant $1,000,000, and it was his understanding that the defendant would not receive any funds as a result of the ABC process.  *See id.*, p. 185, 20-25; 186, 1-8.

Furthermore, Special Agent Fine believed that the note was a forgery based upon an email that he found from the defendant to his original mortgage broker, Dan Ross.  In the email, dated July 19, 2006, Mr. Ross asked the defendant "can I get a copy of the 1M note," and the defendant responded "the $1M note is part of the deal, however, they are accruing interest on the note, not paying it each month."  *See id.*, p. 186, 16-25; 187, 1-4; *see also* Gov't Exh. 27.  Mr. DeRose confirmed that the promissory note was "clearly [a] forgery" and explained that he, as Chief Executive Officer of Global VR, never authorized it.  *See id.*, p. 52; 14; 53:1-7.

Third, it is uncontested that the defendant submitted six fraudulent post-dated checks from Mr. Daddona's company to Countrywide in order to make it appear as though he would be receiving a steady stream of income from Automated Services both in the present and the future. Special Agent Fine testified that he found six $6,000 in Countrywide's loan file.  *See* Gov't Exh. 24.  The checks were made payable to the defendant from Automated Services, and dated a week

apart starting at the end of September 2006 and ending in October 2006. *See id.*, p.187; 7-21; 188, 24-25.  Special Agent Fine testified that he interviewed Mr. Daddona, and reviewed emails confirming that the defendant asked Mr. Daddona to issue the post-dated checks. *See id.*, p. 187, 22.  Moreover, Mr. Daddona, through his lawyer, gave Special Agent Fine a copy of a $36,000 check that the defendant wrote to Mr. Daddona for the six fraudulent post-dated checks. *See* Gov't Exh. 25.  The attorney told Special Agent Fine that the check came from the defendant in exchange for the six checks. *See Transcript of Evidentiary Hearing*, p. 188, 6-25; 189:1-5.

Fourth, the defendant's repayment history after he received the two loans demonstrates that he did not intend to meet his loan obligations.  The defendant's first loan payment was due in December 2006, and just three months later, on March 19, 2007, he received his first Notice of Default and Acceleration from Countrywide on the $2.6 million for already being over $21,000 in arrears.  After receiving the first notice, the defendant made some limited payments.  However, he was never able to come current on his $2.6 million loan and, as a result, continually received Default Notices in April 2007, May, 2007, and July 2007,  August 2007, and October 2007. *See* Joint Exhibit R, Default Notice.

The defendant also failed to make regular payments on his home equity line, and received a Notice of Default on that loan in June 2007.  In September 2007, after continually failing to come current on his home equity line, the defendant received a Notice of Trustee's Sale. *See* Joint Exhibit S, Notice of Default and Notice of Trustee's Sale.

Finally, after the defendant obtained his home loan and received default notices, he drafted a letter to Countrywide's HOPE Team requesting financial assistance. *See* Gov't Exh. 28.  Again, the defendant did not contest the letter during evidentiary hearing.  Special Agent Fine testified that he found the signed letter, dated August 23, 2007, on the defendant's computer during the execution of a search warrant. *See Transcript of Evidentiary Hearing*, p. 190, 18-25.  He was unaware if the defendant submitted the letter to Countrywide, but thought that it was important because parts of it were misleading, specifically:

> In 2005, I sold my business and all of its assets and IP to one of competitors.  The agreement had several payments to be made, including a final payment of $1.6 million due in the fall of 2006.  The company defaulted on that payment, and I relied solely on that payment for my revenue stream for 2007.

1    *See id.*, p. 191, 25; 192, 1-4; *see also* Gov't Exh. 28.

2        In August 2007, the defendant was well aware that Global VR had purchased UltraCade's

3    assets through an ABC process in June 2006, and he would not be receiving any money from the

4    assignment.  *See* Joint Exhibits B and C, Asset Purchase Agreement and Technology Asset

5    Purchase Agreement.  The letter, whether it was mailed to Countrywide or not, demonstrates the

6    defendant's intent to misrepresent the facts of his financial condition for his own benefit.

7        In conclusion, the totality of the circumstances clearly establishes that the defendant

8    fraudulently obtained close to $3 million in loans through numerous false statements and false

9    documents.

10           **iii.    The Government Agrees that There is no Specific Offense Enhancement for
             Loss under U.S.S.G. § 2B1.1(b)(1) for Purposes of the Guidelines Calculation**

11           **Because the Value of the Collateral Satisfies the Loan.**

12       Although the government is extremely concerned about the extent of the defendant's fraud

13   when he applied for his residential mortgage, it has reviewed the Application Note relating

14   to credits against loss in U.S.S.G. § 2B1.1, relevant case law, and documents provided by the

15   defendant.  The government agrees with the defendant that the Court must credit the fair market

16   value of the defendant's residence against the loan in order to determine a loss amount under

17   U.S.S.G. § 2B1.1(b)(1), and in this instance, the value of the defendant's Los Gatos residence is

18   more than sufficient to satisfy the loan from Countrywide.  Accordingly, U.S.S.G. § 2B1.1(b)(1)

19   does not apply.

20                                    **CONCLUSION**

21       Based on the forgoing reasons, the government respectfully requests that this Court find

22   that the loss amount for the defendant's participation in a conspiracy to commit mail and wire

23   fraud is $1,000,000, but less than $2,500,000, warranting a 16-level specific offense

24   //

25   //

26   //

27   //

28   //

**UNITED STATES' STATEMENT**          16

enhancement.  The government concedes that no specific offense enhancement under U.S.S.G. § 2B1.1(b)(1) for the defendant's bank fraud conviction because the loan is fully collateralized.

DATED: 1/22/13                          Respectfully Submitted,

MELINDA HAAG
United States Attorney


_____/s/_____
SUSAN KNIGHT
HANLEY CHEW
Assistant United States Attorneys